We will hear argument today in Case 15-674, the United States v. Texas et al. General Verrilli? Mr. Chief Justice, and may it please the Court, the Secretary of Homeland Security has decided to defer removal of the class of aliens who are parents of U.S. citizens and LPRs, have lived in the country continuously since 2010, and have not committed crimes. That policy is lawful, and respondents concede it is lawful. It is fully justified by the fundamental reality that DHS has resources only to remove a fraction of the aliens present unlawfully in the country now. This class of aliens is the lowest priority, and there is a pressing humanitarian concern in avoiding the breakup of families that contain U.S. citizen children. Mr. Verrilli, to whom? The government, simply. As was suggested in one of the briefs, given these parents of citizens or LPRs, given them identity cards that say low priority, and would there be any difference between that and what this DAPA guidance does? That's a very important point, Justice Ginsburg. That is precisely what deferred action is. Deferred action is a decision that you were, that you are, a low priority for removal, and it's an official notification to you of that decision. And respondents have conceded that we have the lawful authority to do both things, to make that judgment and to give an identification card. General, maybe it would make logical progression if you began with your standing argument first. Yes, and I think this does lead right into the standing argument. I think the principal bone of contention between the respondents and the United States is over whether the Secretary can also authorize these people to work and accrue ancillary benefits, and respondents lack standing to challenge that for three fundamental reasons. First, the injury is not redressable, because even if they achieve the injunction that they want, barring us from providing work authorization and ancillary benefits, we can, for the reason Justice Ginsburg identified, still provide them with deferred action, and under Texas law, they still qualify for a license under deferred action, so there's no redressability. Second, they have not alleged a concrete particularized injury, because the cost that they claim now to be an injury are actually the expected and desired result of a policy that exists in current Texas law. Well, but if they change that policy to avoid the injury that they allege, in other words, if they did not offer driver's licenses to those who are lawfully present because of your policy, avoided that injury, you would sue them, wouldn't you? I'm not sure at all that we would sue them. It would depend on what they did, but the fundamental— Well, no, what they did, I'm hypothesizing, is that they offered driver's license to everyone but not those who were here under DAPA, under your proposal. Chief Justice, the key word in your question is hypothesize, and that's the point, it seems to me. They have not made that change in their law. Well, because they have what seems to me a perfectly legitimate policy, is they want driver's license to be available to people who are lawfully present here. And if you, the federal government, say, well, these people are lawfully present, that means they have to give driver's license to however many of them, more than half a million people who would be potentially eligible for them. And as I understand from your brief, your answer is, well, just don't give them driver's licenses. The current policy is not as Your Honor describes it. The current policy reflected in the existing law and regulation is quite different, and that's the point. They will give a driver's license now to any category of person who has a document from the federal government, not only saying you're lawfully present but that we're officially tolerating your presence. There are vast numbers of people under existing Texas law that are eligible for a license, even though they are not lawfully present. For example, the people who receive deferred action based on childhood arrival. But beyond that, for example, people who are applicants for adjustment of status, of whom there are hundreds of thousands. But suppose the state of Texas said this policy that the government has announced is invalid, it violates separation of powers, therefore we will not issue licenses to this class of persons. I think the point. It seems to me that the federal government could say this is not for you to say. That's correct. We could and we probably would, but the point is they haven't done it, and so in order to establish. But that's the whole point of this suit, isn't it? They don't want to give driver's licenses to the beneficiaries of DAPA. Unless you can tell us that there is some way that they could achieve that, then I don't see how there is not injury in fact. I disagree with that, Justice Alito. You disagree with which part of it? I think all of it. Texas law and policy now does not express that judgment. You look to their law to tell you what their policy is now and what their policy is now. General, when you say that, I'm looking at their law, and their law says that they will give licenses to persons granted deferred action on the basis of immigration documentation received with an alien number and from the government. So that's what you're saying. They've already made the determination that they'll give licenses to people with deferred action. That's one thing I'm saying that's quite important, but it even goes beyond that. No, but they want to do that. Is there anything wrong with their policy saying if you're lawfully present, you ought to have a driver's license? No, but I guess, Mr. Chief Justice, what I'm trying to get across is that the policy, as it's written down, which seems to me has to be taken as the authoritative statement of Texas policy, is not just that they want to give licenses to people who are lawfully present. They give licenses to numerous categories of people who, under the substantive theory of law that they are advancing now, would not be eligible. Okay, so what your argument is then, they should take these people out of eligibility too. No, my argument is we're going to give driver's license to people subject to deferred action. And you're saying, okay, that's your injury. You can take that away. And I just think that's a real catch-22. If you're injured, you have standing. But you're not injured because you can change your policy and not give driver's license to these people. And I suggest that I think you would sue them instantly if they said people here lawfully present under the federal authority are being discriminated against. It's a preemption argument the government makes on a regular basis. And if you don't, the interveners will sue them. They've already said that they think that's illegal. The fundamental problem, Mr. Chief Justice, is with that theory, is that it requires this court essentially to issue an advisory opinion about whether this new law of theirs would in fact be preempted. After all, we might think it's preempted, but it's up to the judiciary ultimately to decide whether it's preempted. So in order for that injury to occur, the judiciary would have to decide it's preempted. So you're saying they would not have injury because they can do this and you might lose the suit. That's correct. I mean, it's hypothetical at this point.  Section 1621 says states aren't required to give state benefits to nonqualified aliens, including deferred action recipients. I guess I don't really understand what the basis of a preemption suit would be given that section. Justice Kagan, I'd like to be able to agree with you about that. We don't think 1621 actually applies to driver's licenses. And depending on what they did, we might or might not think the law is preempted. But until they actually take that step, which would be a significant change from Texas law as it now exists, they really are asking you for an advisory opinion about whether the thing they want to do would be preempted. I mean, if you think about it this way. You're saying that they have inflicted this injury on themselves because they have options. And one of the options, and I assume the one that they would like to pursue,  if you were going to make the argument that they lack standing because they have a viable legal option, I think you'd have to tell us whether, in the view of the United States, it would be lawful for them to do that. I think the Chief Justice asked you that question before, and you didn't get a chance to answer it. Maybe you could answer it now. It would depend on what they did and why they did it. But it does seem to me it's fundamental that they have to do it. Think about it this way. You're saying to us they lack standing because they have an option, but we're not going to tell you now whether it's a lawful option. We'll have to wait to some point in the future. Depending on what they do, we might well think it's unlawful. For example, if they did try to enact a new law that said we're going to give licenses to everybody, we're giving them to now to operate. But there's Article 3 standing for declaratory relief all the time. You say, this course of action is being compelled on me. I want a declaratory suit that says it is void. And I think that gets to the point. That gets to the point, Justice Kennedy. If right now, tomorrow, today, instead of suing us, they had come into court and said, we want a declaratory judgment, we are thinking about, in light of this change in federal law, we're thinking about changing our state law to a different law, and we want a declaratory judgment that if we do so it won't be preempted, I think you would throw that case out in a nanosecond as hypothetical, and that is this case. That is precisely the situation we are in right now. You have to render a judgment on that issue to decide whether they have injury, in fact, with respect to that. Really? Really? Or is it enough that they would have to be put through litigation in order to escape the policy? You say, well, they can just not do this. And I think it's you won't dispute, I think, that they will be put through litigation if they do take that up. I don't think that could be enough, Mr. Chief Justice, because you could have said that in Pennsylvania versus New Jersey or in any number of cases,  Well, how is that different? If I own, say, a parcel of land, and it's subject to some government regulatory program that I think is a taking under existing law, why isn't the answer, well, you should go buy some other land that's not subject to it? You can avoid the injury by your own action. It seems to me that's what you're saying here. Texas says our injury is we have to give driver's license here, and that costs us money, and your answer is, well, maybe you don't have to give driver's license, go change the policy. Just the difference between, in your proposed hypothetical, Mr. Chief Justice, that's a direct action against a landowner by the government. In this case, we're not acting directly against Texas. We're regulating individual aliens, and there's an indirect and incidental effect on Texas. And that gets to, it seems to me, the deeper and broader point of importance here, which is that if you're going to recognize, and it would be the first time, I think, in our history, if you're going to recognize that kind of incidental and indirect effect as a basis for allowing one government to sue another, then there's really no limit on the kinds of things that you can do. Mr. General, in the normal course of things, let's assume that Texas decides tomorrow to change its law, and it says now, contrary to what its law says right at this moment, that it's not going to give licenses to immigrants with deferred action. Presumably, the immigrant who wants that license would sue the state, correct? Precisely. And make either an equal protection or any number, preemption, argument, whatever. The state could then defend that action, correct? Of course. And it could raise legitimately, all standing, to raise any defense in law, correct? Yes. It could then say that DAPA is illegal, correct? Yes. So there is a cause. There is a way for it to defend its actions in the way that it will defend its actions. And I think that points out, I mean, it really goes to what the Court said in Reins against Burr. You know, it may seem like this is an important issue that is teed up in front of you, and it is an important issue. But, you know, the point is that the legitimacy of deciding issues of this importance come from deciding in the context of a concrete case or controversy, and you don't have that here yet. Your argument is this, do I have this right? Imagine a federal statute. Every state must give a driver's license to a member of the Federal Armed Forces. That's a statute. Second statute, we are transferring one quarter of a million soldiers to Rhode Island. Now, Rhode Island thinks the first statute is unconstitutional, and it also thinks that the second statute, for some technical reason, is unlawful. We're only talking about standing. In that circumstance, does Rhode Island have standing? You see, it's totally analogous. I'm trying to say there is a law, which you say is vague. I'm imagining it's there. It says Texas, you have to give a driver's license to certain people. And then there's a second law which says we are sending you a million of those people. Now, all I want to know is can Texas, under those circumstances, your argument is we don't know if that's true here or not, but under the ones I hypothesize, is there standing, in your opinion? Texas would say the first law is wrong, unconstitutional for some reason. The second is wrong because it technically failed for some reason. Do they have standing to say that? I have to caveat my answer because I think if the second law is an immigration law that says we're going to make an immigration policy judgment, that's going to result in additional people being in the state, then I don't think they would have standing. But the fundamental point, I think, of importance here is that the premise of the first law that they're required to give driver's licenses is not present here. I have no doubt it isn't present here. I asked the question to clarify what it is I'm supposed to say if I agree with you. And I tried to answer that and then tell you why I think the premise is different. I did try to answer you and then try to tell you why I think the premise is different. But I do think, and I think there's sort of a shoe on the other foot issue here. If you really think that a state can sue the federal government based on these kinds of indirect and incidental effects, then it seems to me you'd have to also say that if a state decided, for example, that it wasn't going to enforce its minimum wage law anymore and as a result the federal government had to increase its enforcement costs for federal minimum wage laws in that state, that the federal government would then have standing to go into state court and say that the state is violating state law. I don't think anybody would think that's a valid claim. But that's just the flip side of this kind of a claim. Is the injury here any more indirect and speculative than the injury in Massachusetts against EPA? Yes, I think definitely, Mr. Chief Justice. I mean, that was obviously a closely divided court in that case. But with respect to the majority opinion, it seems to me there are two fundamental differences, at least two fundamental differences. One is what the court said is that under the Clean Air Act that Congress had charged the EPA with protecting states and others from the effects of air pollution and then given a specific cause of action to the people whose protection EPA was charged with to sue if EPA wasn't doing its job. And that, and I think this is at page 520 of the opinion, the court said was indispensable, was critical to the finding that states got special solicitude and were allowed to sue in a manner where under Article III they normally wouldn't be able to sue. And in addition, I do think that you do have a quite different situation in that there was no way for Massachusetts to avoid the effects about which was complaining, and there is a way here. So there is a difference. Maybe I could at this point ask you to switch. Yes, I was just going to ask whether I could. Thank you. So I think it's important, again, to frame where we are on the merits here. Texas agrees that DHS has the authority to defer removal of this class of alien parents of U.S. citizens and LPRs. They agree that that judgment is unreviewable. What we disagree about is whether, principally, whether we also have the authority to authorize them to work and to accrue some ancillary benefits based on that work. Before you get to that, could I ask you a question about the scope of your argument? Sure. Under your argument, could the President grant deferred removal to every unlawfully present alien in the United States right now? Definitely not. Why? Here are the limits. Because deferred action has, over time, there have been built up a set of administrative limits, which I'll talk about, some administrative policy limits, and then there are substantive statutory limits. Administrative policy limits are these. Deferred action has always been for the lowest priorities for removal, and everybody agrees. Administrative, you mean by the executive branch? Correct, yes. So that somehow binds the executive branch now? I mean, this hasn't been approved by the executive branch prior to this point either, and yet it's a fairly significant departure. I wouldn't agree with that premise, Mr. Chief Justice, but let me walk through it. So you've got to be the lowest priority. There are regulations going back decades that talk about work authorization related to people with deferred action say that there's got to be a tie to a statutory policy that the Secretary has the authority to implement such things as foreign relations, humanitarian concerns, or family unity when one family member or more is a U.S. citizen. So you've got to ground it. They've got to be lowest priority. It's got to be grounded in those policy concerns, and then there are a number of... But the Chief is going more fundamentally, General. Those are the parameters that the executive has set for itself now. He's asking what keeps you from changing those parameters in the future and simply saying I have, under your theory of the case, I have discretion to defer action on everybody. I think that's his question. A couple of things about that. One is there are statutory constraints that exist now. For example, Congress has told DHS that it has to prioritize the removal of criminal aliens and aliens detained at the border. There's no way we could give deferred action to those populations consistent with... Okay, so not criminals. Who else? Not aliens detained at the border. Okay, so those are the two criminals? It seems to me it would follow from that that people who recently arrived and recently made it into the country, if they aren't detained at the border, we couldn't give deferred action to them either because it seems to me that would undermine the policy judgment of trying to maximize... Okay, so everyone who's been here for two years... And then there are specific statutory provisions that cover some categories of aliens like people with asylum. So then there are a whole host of things that impose manageable limits, and I think if the court were to conclude that there is standing, obviously we don't think there is, but the court were to conclude... I'm sorry. So the categories you say would have to be excluded are criminals, people detained at the border, and people who've been granted asylum. And other than that, the president could grant deferred removal to everyone here. No, I'm not saying that. You've got to grant an affirmative policy like the one here. For example, if you look at the OLC opinion, the OLC reached the conclusion that DHS couldn't grant deferred action to the parents of the children, the parents of people who got deferred action for childhood arrival. Well, if the president did what the Chief Justice hypothesized, let's suppose the president said, you know, there was a time when we had open borders in the United States, and I think that's the right policy, so we're just not going to remove anybody. Who could challenge that? Well, obviously we're doing more or less the opposite now in terms of what we're doing. I understand. It's a hypothetical question. Could anybody in your view challenge that? Yes, I think that would be challengeable under the footnote in Heckler against Cheney that says if you just decide that you're not going to enforce the law at all, then there may well be a cause of action to challenge it there. But that's a million miles from where we are now, and I think the key point is the policy... Well, that's 4 million people from where we are now. Well, you know, that's a big number. You're right, Justice Kennedy. And that's the whole point is that you've talked about discretion here. What we're doing is defining the limits of discretion, and it seems to me that that is a legislative, not an executive, act. So all of the cases, the briefs go on for pages, to the effect that the president has admitted a certain number of people and then Congress approves it. That seems to me to have it backwards. It's as if the president is setting the policy and the Congress is executing it. That's just upside down. I don't think it's upside down. I think it's different, and it's different in recognition of the unique nature of immigration policy. General Verrilli, how much of a factor is the reality that we have 11.3 million undocumented aliens in the country and Congress, the legislature, has provided funds for removing about 4 million? So inevitably, priorities have to be set. Right, exactly. You started out telling us that the enforcement priorities were not at issue, that the problem was the benefits that flow from that, the work authorization, the earned income tax credit, the Social Security benefits, the Medicare benefits. So as I understand it, and I think this is the point you made, the other side is not disputing the fact that you have authority to exercise discretion. Correct, and that, I think, is the answer that I was going to give to your question, Justice Kennedy, and it seems to me with respect to this. Mr. General, before you go on, just to make sure we're on the same page, you only deport 400,000, not 4 million. Forgive me, yes. So we have basically 10,900,000 people that cannot be deported because there's not enough resources, correct? That's correct. So they're here whether we want them or not. And the key point is that we have always had a policy that says when your presence is going to be officially tolerated, you're not here, you're violating immigration laws by being here, you don't have any rights, but your presence is going to be officially tolerated. When you're in that circumstance, we allow you to work because it makes sense to allow you to work because otherwise you're going to be here, and otherwise, if you can't work lawfully, you're going to either not be able to support yourself and be forced into the underground economy. I have to ask you about two pages in your reply brief. On page 16, you quote the guidance that says the individuals covered are lawfully present in the United States, and less than a page later, you say aliens with deferred action are present in violation of the law. Now, that must have been a hard sentence to write. I mean, they're lawfully present, and yet they're present in violation of the law. Well, I actually had no trouble writing it, Mr. Chief Justice. The reason I had no trouble writing it is because that phrase, lawful presence, has caused a terrible amount of confusion in this case, I realize it, but the reality is it means something different to people in the immigration world. What it means in the immigration world is not that you have a legal right to be in the United States, that your status has changed in any way, that you have any defense to removal. It doesn't mean any of those things, and it never has, and so it doesn't. And so at that fundamental level, we are not trying to change anybody's legal status under the immigration law. Lawfully present does not mean you're legally present in the United States. I'm sorry, just so I get that right. Yes. Lawfully present does not mean you're legally present. Correct. But the DAPA beneficiaries may lawfully work in the United States. Isn't that correct? That's right. How is it possible to lawfully work in the United States without lawfully being in the United States? There are millions of people, millions of people, other than the DAPA recipients about whom this is true right now, and this gets to the point of why their reading of Section 1324 is completely wrong. I'm just talking about the English language. I just don't understand it. How can it be lawful to work here but not lawful to be here? Let me just go through the reality here, and I'll give you some sense of just how disruptive a ruling would be to accept their theory on who can lawfully work in the United States. Right now, since 2008, one category of people who can get work authorization are people applying for adjustment of status. We've given out 3.5 million of those to that category of people since 2008, and in the decades before, it was hundreds of thousands of people a year. They are not lawfully present in the United States in the sense of having lawful status. People who have applied for cancellation of removal, those are people in removal proceedings now. Since 2008, we've given out 325,000 of those. But those are statutory categories, are they not? No, there's no statutory authority to do either one of two things, either to say that they're lawfully present in the United States. There's no authority for that, and this is the key thing for their work authorization argument. There is no statutory authority to grant work authorization to those categories of people. In those other categories, did you say that those people were lawfully present in the United States? No, but you said that here. But the key point is that their argument about why we can't give work authorization is a statutory argument. They say that 1324 passed in 1986 extinguished our right to give, our authority to give work authorization to people whose presence we're officially tolerating. What I'm saying is that that is not a plausible reading of the text. There's a 1987 regulation that INS promulgated which considered that very question of whether passage of that statute restricted INS to giving out work authorization only to people who are in categories specifically identified in the statute. INS rejected that as implausible and inconsistent with the theory. That's been on the books for 30 years. It's entitled The Chevron Deference. And then the third key point is the consequences point. This argument they're making says, you know, if you go through the reg that's in the petition appendix that lists all the different categories of people who get work authorization, their reading of 1324 knocks out like 15 or 16 of those categories. It just doesn't. It's not that. It doesn't just apply here. Do they have a way of attacking that 1986 regulation? Yes, absolutely. They could petition for rulemaking. And that would be under Section 553C? Right. They could petition for rulemaking. Did they do that here? No, they did not do that here. I'm sorry, Justice Kagan. Could you have done the exact same thing without using that phrase in the DAPA documents? Yeah, absolutely. And, in fact, if the court thinks it's a problem and wants to put a red pencil through it, it's totally fine. Really. I understand the issues that it's caused. But its legal significance is a technical legal significance with respect to eligibility for Social Security benefits and for this tolling provision. And that really, you know, that's the tail on the dog and the flea on the tail. You were asked about an APA action. If they brought an APA action, would they be entitled at least to ask for a preliminary injunction while the notice and comment procedure was in place? I don't, you know, forgive me, Justice Kennedy. I haven't thought about that. I have my doubts that they would be entitled to get a preliminary injunction under those circumstances. They would have standing to object if the rulemaking hearing came out the wrong way. Well, I think if we're talking about whether there's a notice and comment issue here, you've decided that they have standing. So if they have standing to get to the notice and comment issue here, they'd have standing on the notice and comment proceeding. Sure. But they don't have standing in court. Necessarily. I mean, loads of people have standing. Sorry, I wasn't clear, Justice Breyer. If this Court decides, if this Court gets to the notice and comment issue here, this Court will have decided that they have Article III standing. And if they do, then they would then, too. I'm not sure when he announced, when the President announced DACA, the predecessor provision, he said that if he broadened it, this is a quote, then essentially I would be ignoring the law in a way that I think would be very difficult to defend legally. What was he talking about? So I think there's two possible things. One is what DACA does is what DAPA does, which is provide tolerated presence and essentially the ability to work. If he had said, I'm actually going to give these people lawful permanent resident status or legal status, that would be going further. Or say they were lawfully present. Well, as I said, I really think that. And then second, the other thing is maybe he thought he couldn't extend it at that time to DACA, but what happened here is that the President and the Secretary went to the Office of Legal Counsel and asked for an opinion about the scope of their authority, the scope of this discretionary authority, and they got one. And they exercised it consistently with that and up to the limits of that and no further. And so I do think whatever the President may have meant, we went through that process, came to that conclusion, and acted on that conclusion in respect to the limits that OLC decided. There's no challenge to DACA. No, right, which as a legal matter is no different. If I might reserve the balance of my time. Thank you. Thank you, General. Mr. Sines. Mr. Chief Justice, may it please the Court, the Jane Does, three Texas mothers of U.S. citizen children, seek the opportunity to apply for discretionary, temporary, and revocable relief from the daily fear that they will be separated from their families and detained or removed from their homes under the current non-uniform and frequently arbitrary federal immigration enforcement system, which fails to provide any reliable opportunity to be identified as low priority. Their own state of Texas, through this suit, has blocked the guidance that would secure the Jane Does an opportunity to step forward, register and apply, and obtain a timely decision with respect to deferred action. Texas does so based on asserted indirect and speculative budgetary injury that contradicts the state's own legislative decision, after balancing all policy considerations, to subsidize and encourage the acquisition of driver's licenses with no annual or cumulative limit on subsidies in that form. Do you think it would be illegal if Texas adopted a policy saying everyone lawfully present in Texas except people subject to DAPA get a driver's license? I think it would be, in candor, subject to a challenge that would revolve around the circumstances and the reasoning behind that new legislation. It's important, of course, to note that Texas has not done that, and there's no indication that its legislative process would result in determining that its previous decision that subsidized licenses make sense without limit has some end point. The circumstance that you've described, where it specifically targets one set of deferred action recipients, would certainly raise questions. How about if they just said, let's take it out of DAPA, if they just said, you know something, there's too many deferred action people, it doesn't matter why you're deferred, political refugee, the people waiting for a different status, we're just going to do it for everybody. In that circumstance, I think it too would be subject to challenge. It would be a different challenge because the circumstances and the reasoning would be different. There would be equal protection claims. There might be preemption claims. And those would be resolved in the kind of concrete clash of real interest that this Court has indicated Article III supports. You would have the state of Texas defending a decision it has made to change its law and to keep that law in place, and you would have agreed individuals who would have been denied a driver's license because of that change. Not every state grants licenses to deferred action individuals, do they? That's correct, Your Honor. In this case, it would arise in the context of a change which could raise equal protection concerns to be resolved in the kind of concrete clash of interest that this Court has indicated are behind Article III. I think it's important to note that not only has Texas not changed its policy. Do I take it from the way you're phrasing this that you actually think that the equal protection concerns would be more serious than the preemption concerns? I think it depends on the circumstances of how Texas is to make its decision. All the more reason to wait until it's actually made a decision through a legislative process where there would be a record of why the legislators chose to change from a policy that currently provides licenses to anyone who can demonstrate that they're authorized to be in the United States to something that would leave some folks in that category out. If they would decide that tolerated presence is not authorization, for example, we would have a record of why they made that decision. Of course, we are not there yet because Texas has not made a decision to change what its current policy is, and there is no indication that the legislation... In the record, which you're more familiar with than I, and I'd ask the other side the same question, I've read in the briefs quite a lot that the reason that they don't want to give driver's licenses to these 500,000 extra people is it's expensive. Yes, Your Honor. Is there any other reason that's in this record such as we could imagine other reasons? Is there any serious effort to rest their claim, we don't want to give them licenses, on anything other than money? Yes, Your Honor. What? I think that Governor Abbott has indicated in the record... In the record here? Yes, it's in the record here, I believe, Your Honor, that in fact this is a political dispute. They do not agree with the policy adopted by the administration, though they have conceded in this case that it is within the executive's discretionary authority. You're talking about in general. I'm focusing on the narrow question of how Texas is hurt specifically, not a political disagreement. How are they specifically hurt by giving these people driver's licenses? Your Honor, they... One way is it costs them money. Yes. Are there other ways? No, Your Honor. That's the only thing that he put forward in one declaration. And in fact it shows that they believe they would face additional expenses, though there's not really enough to conclude that it would change the state's previous determination taking into account those costs from every subsidized license. Isn't losing money the classic case for standing? It is a classic case for a private individual, Your Honor, but here we're talking about a state that has made a decision, as states often do, to spend money by subsidizing licenses because it's balanced other considerations. We said in Massachusetts against EPA that we have a special solicitude for the claims of the states. Yes, and in that case it was not a financial claim. As you know, Your Honor, it was a claim related to the state's quasi-sovereign interest over land. In addition, as General Verrilli has indicated, there was a procedural right within the Clean Air Act that does not exist here. Indeed, if a procedural right were to be established under the APA itself, there is no limit to the number of states that can come forward to challenge any domestic policy of any kind by this or any future administration. If an employer took the position that the employer was not going to hire a DAPA beneficiary because the employer believes that they are not lawfully authorized to work, would prefer someone else over them, could that person sue on any theory of discrimination, for example, under Section 1981? They could, Your Honor, and the outcome of that case, I think, has not been clearly established by precedent so far, but it would be a clash between folks with concrete interests, an employer who wants to hire someone, not the individual who found them. Well, if that's true, then DAPA gives them a legal right. It's more than just putting them in a low-priority prosecution status. I think it's important to note, Your Honor, that work authorization is a separate determination from deferred action itself. Not everyone who receives deferred action will receive work authorization. I also think that work authorization, in your view, gives them a legal right they did not have before. It gives them the right to work with authorization, certainly. However, I also need to go back to standing and point out that work authorization has nothing whatsoever to do with driver's licenses in Texas, where the test is authorized to be in the U.S. But when you answered the question about you said there might be a 1981 suit, you were not saying who would win that suit. That's correct. You're saying it's a question. It's far from clear. Not that they have a legal right, but anyone can sue. You can always sue. It's far from clear. I think the precedent is not clear enough to determine the outcome of that. But what is your position on that? Our position would be that it is something to be litigated. In fact, in all candor, we have litigated it to a settlement. So no established precedent to make it clear one way or the other. But you believe they do have the right? They do have work authorization, and that certainly means that they ought not be subject to unreasonable discriminatory bases for denying their work. It's different from when they don't have work authorization. But going back to the work authorization, it has no relationship to the driver's licenses. In fact, they could receive licenses without ever applying or receiving work authorization. There's no connection between the two. Therefore, any concerns about work authorization would not redress the injury behindstanding of the state of Texas. on an employer who employed individuals who were not authorized to work. So if an employer in Arizona hires DAPA beneficiaries and the state attempts to impose those civil penalties on that employer, I assume that you believe that DAPA would provide a legal defense to that. I believe there would be a defense before that because the Whiting case involved a requirement to use the E-Verify system. Under the E-Verify system, those who are work authorized, whether through deferred action or otherwise, should come back as authorized workers. So I think the state of Arizona, which premised its statute, in part to receive this Court's blessing of that statute, on relying on federal decision-makers would not be in a position to engage in what you've described. Well, prior to DAPA, if the employer had employed these individuals, the employer would be subject to those penalties, would it not? That is correct. After DAPA, it would not be. Work authorization is an authorization to work that is separate from the deferred action determination. Basically, the state of Texas has conceded the deferred action determination and seems to be focusing on work authorization, but that work authorization has absolutely no relationship to the alleged injury of driver's licenses. I see my time is up, Your Honor. Thank you, Mr. Sines. General Keller. Thank you, Mr. Chief Justice, and may it please the Court. DAPA is an unprecedented, unlawful assertion of executive power. DAPA would be one of the largest changes in immigration policy in our nation's history. How can you say that? I mean, we have the Fairness Act that happened in 1990. It granted basically the same thing, deferred action and work authorization, to 1.5 million people out of 4 million. That was 40% of the immigrant population of the time was affected. Here, the best estimate is that only 35% are affected. So at least once before, the President has taken action that has a greater percentage effect than now. So why is it the largest? Is it the number of people? The Family Fairness Program, first of all, was done pursuant to statutory authority. It was a voluntary departure program. It was not an extra statutory deferred action program. Also, only 47,000 people actually got relief there. And what Congress did in 1996, after the Family Fairness Program— Well, that's because Congress decided to step in. Here we have a Congress that's decided—some members of the Congress have decided they don't like it. And so Congress has remained silent. It doesn't mean that at some later point, after the election or whenever, Congress can't step in and do what it wants to do. But, Justice Sotomayor, I think that's backwards. I think Congress has to grant the statutory authority first for the executive to be able to act. And to do so on a question that's of this deep economic significance, it would have to do so expressly. You know, you keep saying that, deep economic significance. Those nearly 11 million unauthorized aliens are here in the shadows. They're affecting the economy whether we want to or not. The answer is, if Congress really wanted not to have an economic impact, it would allot the amount of money necessary to support them. But it hasn't. But what Congress did in 1986 with work authorization and 1996 with benefits is it restricted work and benefits as an alternative mechanism to enforce immigration law. Those judgments acknowledge there are going to be people in the country that are unlawfully present. And yet Congress put forward those barriers to work and to benefits precisely to deter unlawful immigration. What the executive is trying to do here is flout that determination. Except that the work authorization ability of the Attorney General to do has been clearly stated since 1986. Congress hasn't taken that away. It may at some later point. But it still has not undone the 1986 regulation. But in 1986, Congress passed a comprehensive framework for combating the employment of unauthorized aliens. That was a decision to repudiate the past practice and enact a general federal ban on the employment of unauthorized aliens. And the regulation permitting the Attorney General to give work authorization to deferred action individuals has stood since that time. But when that regulation was passed in 1987, the executive said that the number covered by that regulation was so small as quote, to be not worth recording statistically, unquote, and quote, the impact on the labor market is minimal, unquote. So regardless of what Congress may have acquiesced to afterwards, that regulation has always been known as being for a small class of individuals for deferred action. But it's been applied to a large class. It was applied to a large class in 1990. 1.5 million out of 4 million, 40% of the illegal population. That was a fairly significant number, and Congress didn't act thereafter. In fact, it expanded the program the President had started. The 1990 Family Fairness Program was a voluntary departure with statutory authority. Congress responded in 1996 by capping it at 120 days, and the executive acknowledged that when Congress did that, it could no longer authorize employment under that voluntary departure program. Exactly. But here, with deferred action, the executive has only been granting 500 to 1,000 deferred action permits a year. There's no way Congress would have acquiesced to granting 4 million permits. Well, it has acquiesced to larger numbers of Salvadorians, Guatemalans, Honduras, Haitians, Chinese, the T&U visa applications. Those numbers have been much larger than the limited numbers you're quoting right now. And those programs would have been under temporary protective status, humanitarian parole, deferred enforced departure, which is justified and has been at least under the President's Article II power, and there's no suggestion of that. Here, DAPA is unprecedented because this is an extra-statutory deferred action program that is not bridging lawful status. The aliens do not have a preexisting status, and they don't have an eminent status. General, can I take you back a few steps? General Varela said a couple of times that you've essentially conceded the legality of DAPA, taking out the work authorization and the Social Security benefits. Is that correct? No. I'll be very clear. When the executive is forbearing from removal on a case-by-case basis, that is what this court in Reno noted was deferred action enforcement discretion. But when the executive is transforming unlawful presence into lawful presence and granting eligibility for work authorization and Medicare and Social Security. Let me make sure I understand that. You're saying that the government could do this case-by-case, one-by-one, with respect to all the people in the class, but that the government cannot identify the entire class and say we're forbearing from enforcement. Is that correct? While that would be a harder, tougher case, I do believe that they could do it class-based if they were simply forbearing from removal. So that's what I asked originally. If they were simply forbearing from removal and there was not work authorization attached to it and there was not Social Security or any other benefits attached to it, are you conceding that? In this case, given that they are removing 400,000 people a year, we admit that they could do forbearance from removal, but what they can't do is grant authorization to be in the country. Can I ask a specific thing? You have a statement in your brief and it says that the executive could give cards, identification cards, to all these people saying low priority. Are you adhering to that? Is that what you mean? These people, you're objecting to work authorization, Social Security, but the government, not one-by-one, but to give everyone who fits into this category a card that says low priority. The government, as part of its enforcement discretion, could do that, but that's very different than what they're doing here where they're granting lawful presence. And that matters because that's why we have to grant driver's license. That's why they get... General, are you just referring to that single phrase in the DAPA memorandum? Is that what you're referring to? Because General Verrilli, of course, says you could strike that phrase today if you wanted to, that that phrase really has no legal consequence whatsoever, that all this document does is do exactly what you said, which is to grant forbearance, to tell people you are not our enforcement priority, we are not going to deport you until we say otherwise, which we can tomorrow too. That lawful presence phrase is key because that's the first time in a deferred action program the executive has taken that position. But even if that phrase were struck, that would still not cure the defect. And the reason is because what the executive is doing when they're granting deferred action is they're affirmatively granting a status. And we know that from their own benefits regulations, which say... This is 8 CFR 1.3. Sub A says lawfully present, qualified if you're in deferred action status. And then Sub B says, well, just because we're forbearing from removal, that doesn't necessarily mean that you're lawfully present. And so what is going on here is a transformation of deferred action from what this court recognized in Reno to something far more than forbearance from removal. It is granting a status. And that status then entails certain things beyond even Medicare and Social Security. For instance... I really did want to note, just take out the work authorization, take out the Social Security, and take out that phrase. Can the government say to all of these people, and say it all at once, not one by one, yes, all of you are low priority, and we will not be coming after you, and we will not support you unless we change our minds. And, Justice Kagan, they can do that, and they can do that under the unchallenged prioritization memo. But what they can't do is say it's deferred action that grants a status under the benefits regulation. I think that's just a label. Can they do that? It is a label, but it's a label that Congress created. My hypothetical is, I mean, you're suggesting that the label has some legal consequence. And my hypothetical is, we just say to these however many million people it is, you will not be deported unless we change our minds. Can they do that? If that's all they were doing, yes. But as soon as they link it... Even though it's many millions of people, they could do that. And they can do it all at once. Yes, as long as they're not abdicating. And here, we are not challenging the prioritization. Okay, so if that's right, then it seems to me you're real gripe here, and maybe it's a real gripe. You're real gripe here is to the work authorization piece and to the benefits pieces. Is that right? And the granting of lawful presence, because that is what's going to... That's just a label that General Verrilli says they could strike out in a moment. Well, that's their position, but that's wrong. And the reason it's wrong... It's their memorandum. It is their memorandum. But is it a statutory term? Does the term lawful presence appear in statutes enacted by Congress? It does. It appears in IRIRA, the reentry bar. It appears in the Social Security and Medicare. It appears in the gun possession statute. Lawful presence allows an alien to possess guns. That's the Oriana case that we cite from the Fifth Circuit. And they're treating it as also allowing advanced parole, which we now know apparently some DACA recipients have gotten green cards and a path of citizenship. But then it seems to me, General Keller, that what you should be attacking is not DACA. What you should be attacking is the work authorization regulations that the DHS or before that the INA has had for 30 years, or you should be attacking other connections that DHS is making with respect to these people, but not DACA itself. But, Justice Kagan, I think it is DACA itself that we're challenging, and the reason why is because that is what is transforming unlawful conduct into authorized lawful conduct. But does it say that in the DACA? We have the DACA directive. I didn't see anything in it about work authorization or about Social Security. The DACA directive does not mention Social Security. It does mention work authorization. This is Pet Act 413A, and I'll quote from it. Deferred action means that for a specified period of time, an individual is permitted to be lawfully present in the United States. Now, the executive wants to take the position that that has no legal consequence. Of course, the OLC memo at JA 76, and this has been misquoted in their reply brief, said that what's going on with tolerated presence is deferred action will be toleration of an alien's continued unlawful presence. Now, if it's continued unlawful presence, they're not authorized to be in the country. We don't have to issue driver's license. They can't get Medicare, Social Security, gun possession. Do you tie the driver's license to work authorization? Let's say somebody is in this deferred status but isn't working. Under Texas law, do they get driver's licenses? Under Texas law, and this is our Texas statute, if someone is authorized to be in the United States, they're eligible for a driver's license. In some of these, they don't have to have any work authorization. That's right. They need to be authorized to be in the country. But to give some context to how this works, we have to rely on the federal government's immigration classifications, and when we determine whether someone's eligible for a driver's license, we run that through the federal safe background system. So we ask the federal government, is this individual authorized to be in the country? They say yes or no. Well, the government also says you don't have to do that, or maybe you don't have to do that and maybe or maybe not they won't sue you, but why don't you go ahead and not give them driver's license? Well, I think, as Your Honor had suggested before, that we are in a catch-22 here. Either we have to not incur millions of dollars of financial harm, which is a quintessential Article III injury, or we have to change our law, and somehow we have to come up with a different background check system. We wouldn't have a uniform policy. I'm sorry, how does somebody get a license in Texas? I know how to do it in New York and Washington because I've lived in both places, but I don't know how to do it in Texas. Do you go up and you do what? You would go to the Department of Motor Vehicles, you would show the documentation showing who you are and that you're eligible for a license. Now, in the context, though, of aliens, and this is a J377 to 382 outlining the process, then the state verifies that the individual has authorization to be in the country, and that's sort of the federal rule idea. Now, I do know, because I've experienced it, that lines are very long at DMVs. Sometimes people wait the entire day, and I know that they leave the next day when they haven't gotten to them, and they keep coming back. It's not an ideal situation, and most states, to avoid the frustration, do ramp up, but many states don't. People just keep coming back until their license can be processed. So why is it that you have to spend all this money? Why can't you just have your regular process and let people wait online? Well, first of all, under the Federal Real ID Act, if our state's driver's license recipients want to be able to use that license to get through airport security, TSA security, there has to be integrity in the license for the federal government, and so we have to check whether an alien is actually out there. I'm just saying, why do you have to ramp up? I think one of the allegations, I haven't really gone through it carefully enough or assume it's true, claims that your affidavit estimating losses in your process is made up, basically, because there's already a built-in profit from profiting licenses of $25 that you really don't know if you have to add all this personnel because 5 million people are not going to walk into DMV in one day and that the numbers are going to be much less no matter what because not all 5 million are going to want licenses to start with. So the question I have is, why do you have to ramp up? Why can't you just let people wait online? Yeah, so this is a J377 or 382, and the reason is because there's going to be a spike in the applicants for driver's licenses and there are much more to do than simply granting the license. There would have to be processing the paperwork, making other determinations, but in any event, that is a fact finding. But you did that in the speed you do it in, meaning I got a temporary piece of paper when I was there and it took weeks for me to get the regular license while the Motor Vehicle Bureau did what it was going to do as fast or as slow as it wanted to do it. Well, and here we have a fact finding that we would incur these costs. Neither parties on the other side have said that this is clear error. This is a jurisdictional standing question. It is a jurisdictional standing question. Can we just accept at face value something that might not be true? Can we give you a standing just on the basis of you saying, I'm going to do this when it makes no sense? We have a fact finding here. They have not alleged it's clear error. We also have declarations in from Wisconsin and Indiana that have not been challenged. The bottom line is if we're going to have to issue more driver's licenses, it's going to cost more money. That's the point, and I would like to ask a question. The only thing I found here is about money, really. If there's something else that's worrying you, it's sort of hidden. Money is money. I understand that. And my question is about the standing. And this is technical, but it's important to me. Looking at the briefs, awful lot of briefs, senators, both sides. Awful lot of briefs from states, both sides. Members of Congress, why? Because this has tremendous political valence. Keep that in mind. Now, keeping that in mind, let's go back to two old cases, which are scarcely mentioned. But old Supreme Court cases never die. Unless, luckily, they're overruled. And a few have been. But they're submerged like icebergs. The one I'm thinking of is Frothingham v. Mellon, Massachusetts v. Mellon. And there, in those cases, the federal government had given something to some people. There were beneficiaries. Other people wanted to sue because they said, that means we're going to have to pay more money. And the court said, you are the people from Massachusetts. I'm sorry, Massachusetts lost. But lo and behold, it did. That's just because I'm from Massachusetts. But the point is they lost because, says the court, we can't let you just sue on the basis that you as a taxpayer will have to spend more money. Because if we do, taxpayers all over the country will be suing in all kinds of cases, many of which will involve nothing more than political disagreements of all kinds. And before you know it, power will be transferred from the president and the Congress, where power belongs, to a group of unelected judges. And for that reason, we say, you individuals who will have to pay more money, will, cannot just sue on that basis. And as for the state, it cannot represent you parens patriae, because this is between the federal government and the citizens. They're the ones who have to pay. And as far as Massachusetts is concerned, again, bringing up to a case they won, that was their own coastline. And that's not money. That's the physical territory belonging to Massachusetts. And, of course, they have standing to protect that. Now, I want your thing for a second. I'm finished. You see my point. And I want to know how you get around that. Massachusetts v. Miller, that when you give a benefit here, hurt the taxpayer by a money over there, he doesn't have the kind of interest that gives him standing. First, we're raising financial harms from our own state's fisc. That's not a parents patriae theory. And we're also raising sovereign harms, and that's Massachusetts v. EPA. We have ceded to the federal government the authority to determine who is lawfully present within the borders of the 26 states. Now, well, sovereign harms, you realize, would follow a fortiori. Because if a state cannot sue and its citizens cannot sue to stop the feds from giving somebody a benefit, on the ground it will cost the state or the individuals more money. Surely they cannot sue just by announcing it requires a change in law in general or because it requires, hurts our sovereign interest. For then every case of political disagreement where states disagree would come before the court. Well, but I think a lot of those cases would be taken care of through causation requirements, injury and fact requirements, and the zone of interest test. For instance, the adjusted gross income example and the veterans benefits example that the other side has brought up, I think all those cases would be screened out through the zone of interest test. Here, we put forward over 1,000 pages of evidence into the preliminary injunction record with over a dozen declarations and have fact findings establishing exactly what Arizona v. United States said, which is that the states bear the consequences of illegal immigration. And when we can come to court and show a concrete injury and a policy that is causing that injury, and by enjoying that policy we wouldn't have to incur either the financial harm or the sovereign harm, that's precisely what you have to do. Well, but that really hits the states against every federal agency. And any harm, financial harm, that indirectly flows from a change in policy would be subject to attack. Let me give you a prime example, okay? Imagine Texas passed a law forbidding its state pension plan from investing in any financial company whatsoever that the Federal Stability Oversight Council declares systematically important. Too big to fail. Texas reasonably doesn't want to invest money in companies that if they fail are going to tank the economy. Now let's say the federal government sets out a policy memorandum that says in our discretion, we are not going to declare some insurance firms under a certain size as too big to fail. We just don't think we should, okay? Why can't the states sue that federal agency and say the law mandates that you tell us who's too big to fail? I don't think states would be protected by laws governing which banks are too big to fail, but states absolutely are protected by immigration laws saying who is lawfully present within our borders. So that would be weeded out under the zone of interest test. We've already said in Arizona versus Whiting that you can't tell the federal government who to say is legally or not legally present here. You don't have a right to set immigration policy. You're not in the zone of interest of the immigration law. Oh, we absolutely are, and that's precisely why I'm standing here. Because as the court recognized in Arizona, just because the federal government pervasively regulates immigration, that doesn't mean that the states don't have a significant interest in who is within their borders. We have an easily identifiable sovereign interest on who is within our borders. But the states can't remove anyone, and we still go back to the basic problem, 11.3 million people, Congress not appropriating money to remove more than, what is it, 4 million of them. So there are these people who are here to stay no matter what, and you have conceded that the federal government can say, low priority, here's your card, not going to deport you unless we change our mind. So the only thing that's involved is the work, and you haven't challenged that separately. You're challenging DAPA. And DAPA itself purports to grant not only work authorization, but also transform unlawful conduct into lawful conduct. We've already gone through that. We have agreed that that means tolerated presence. The government has said, take out that word. It was unfortunate that we used it. What we mean is tolerated presence. But it's not just an unfortunate slip. When they're granting deferred action status, under their regulations, that is lawful presence. So they want you to take out lawful presence from the DAPA memo and pretend lawful presence isn't in there, but then when you go into the regulations... But then why aren't you challenging the regulations? I mean, I understand what you're saying, that DAPA in some sense triggers the regulations, but only because the regulations say what they say, that your real challenge is not to DAPA, which is the non-enforcement part of this. Your real challenge is to the regulations. The fact that non-enforcement leads to a certain set of results, and yet you're not here challenging those regulations. Well, insofar as you conceive of our case of challenging those regulations, we'd be challenging them as applied to DAPA. But when Congress legislates... The problem is that you haven't exhausted administratively, and we always require you to do that. There isn't an exception, as I understand it, under the APA, for your failure to exhaust your avenues in the agency first. But we are challenging DAPA. We are challenging that memo. Can I... Please, go ahead. And when we bring forth that suit, which only accrued as of November 20, 2014, just because we're challenging DAPA's granting of deferred action doesn't mean in the four narrow categories that Congress has passed statutes allowing deferred action for VAWA self-petitioners, T&U visa applicants, and widows and widowers, that somehow we'd have to also be challenging... Do you think this... Suppose that instead of doing DAPA, DHS had decided to go one by one by one, and it just sent a notice to each person. Do you think at that point that DHS could also say, and this will include work authorization because of our preexisting regulations? Insofar as they were granting lawful presence, no. Work authorization, I think at most you'd look at what has there been congressional acquiescence to this minimal program. I guess I'm not sure I understood the first part of that because just take out the labels. It notifies a single person, you're low priority, we're not going to deport you unless we change our minds, and by virtue of preexisting regulations, you now can work on the books. Is that legal? Could DHS do that? I don't think there's statutory authorization. There may have been congressional acquiescence to a practice in very small cases that's bridging lawful... See, that's interesting because I thought, and as you said, there's not statutory authorization with respect to that, and I thought your entire argument is that they can't do this except for statutory authorization. And now you're saying, well, in some cases they can do it. Well, Justice Kagan, we have multiple arguments. The first is a statutory argument. And our backup argument, which is a response to the executive's congressional acquiescence argument, is that at most Congress would have acquiesced to a practice of very small uses that were bridging... Okay, how about this? DHS doesn't do it one by one. How about DHS says it's senseless to do it one by one. We should use some categories. Here's the category. You've been here for 25 years. You're entitled to, not entitled, you can stay unless we change our minds. So that's the category. It's a smaller category, but, you know, there's a lot of people in that. If there was no previous lawful status or an eminent lawful status, there's no way Congress has acquiesced to that. And if I can back up... Now, wait a minute. So that's important. So DHS cannot say to all the people who have been here for 25 years and have been perfectly law-abiding, Congress cannot say to those, you know, tens of thousands of people, let's say, not millions, tens of thousands, we won't deport you unless we change our minds, and you can work, you can feed your families, you can do that. DHS cannot do that? Congress could. DHS does not have statutory authority right now, carte blanche authority to grant lawful status. This has nothing to do with the scope of this policy. This has nothing to do with, oh, how many millions of people are in this policy. You're saying even with respect to a much smaller policy of the kind that DHS or its predecessor agencies have done literally every year for the last three decades, that all of that was ultra-virus? Mr. Chief Justice, see my time's up. Please, you may answer the question. When we're talking about the scope of the program as opposed to bridging lawful status, the scope goes to is this a question of deep economic significance? It also goes to when the 1987 work authorization was justified, the executive was telling everyone through the administrative process that this was for a minuscule number of people and it wouldn't affect the labor market. And this also brings to light that here the executive didn't even use notice and comment in promulgating this sweeping. Their theory is that they can grant deferred action where there's not going to be lawful status, that no court can review it, and they didn't even use notice and comment procedure. That is unprecedented, is a sweeping assertion, as Justice Jackson said in Youngstown, it is the duty of the court to be last, not first, to give up the separation of powers. Thank you, General. Ms. Murphy? Mr. Chief Justice, and may it please the court, three years ago the executive asked Congress to enact legislation that would have given it the power to authorize most of the people that are living in this country unlawfully to stay, work, and receive benefits. And Congress declined. Now the executive comes before this court with the extraordinary claim that it has had the power to achieve the same act unilaterally all along. Was that part of the package for a pathway to citizenship? It was not a pathway to citizenship, it was a pathway to lawful presence in the country that would have allowed individuals to have a legal status to remain in this country, and Congress has not created a legal status for the category of individuals covered by DACA. That's correct. Why do you think this is a legal status in the way that that bill imagines? It is a legal status because under the agency's own regulations, it is a status that has consequences. And I would point you in particular to 8 CFR 1.3. This is the statute that defines the term lawfully present. Under that statute, if you are in deferred action status, you are lawfully present and eligible for benefits. Now that statute goes on to say if you are just an individual as to whom DHS has declined to pursue removal proceedings, you are not lawfully present. So whether you are in deferred action status makes a difference under the agency's own regulation. It's that affirmative act of not just forbearing and making the decision not to remove somebody, but putting them into deferred action status that triggers the availability of work authorization and eligibility to receive benefits. So why don't we just cross out lawfully present as DSG has suggested? You can't cross it out and achieve what DAPA is supposed to achieve, because what really matters in DAPA is that it is allowing the grant of deferred action status. Whatever the executive wants to label that, under its own regulations, deferred action status is equated with lawful presence. So if you cross it out of the DAPA memo, it's still part of the regulatory scheme that says once we've taken this extra step, not just of deferring the removal of you, but of putting you into this status, that changes your eligibility for work authorization and benefits in this country. And once the executive is doing that, we are far outside the notion of mere enforcement discretion. If you agree with the card that says low priority, that nothing about work authorization, nothing about social security, that you are low priority, which means we'll probably never get to you because Congress hasn't given us the money to remove you. Well, we would not necessarily concede that you could actually grant people cards that say we're not going to enforce the law as to you. But that's all not at issue in this case, because what the executive wants to do is something much more than that. If all they wanted to do was say we're not going to enforce as to you, the only memo they would have issued is the enforcement priorities memo. Because in order to qualify for DAPA, you have to already not be an enforcement priority under the enforcement priorities memorandum. What the executive wanted to accomplish was something more, to say not only are you not an enforcement priority, but we want you to be eligible to work and to receive benefits. And the way that we do that is by taking this affirmative act of converting you into a status that under our own regulation changes your eligibility. Why wouldn't the appropriate way for Texas to proceed has been to challenge the regulation under the APA, I think it's Section 553, and then if they were concerned about notice and comment, taking too long, asking for a preliminary injunction? I don't think that's the way that it actually makes sense for this to proceed, because there's nothing inherently problematic about a regulation that ties deferred action status to work authorization. Congress has passed multiple statutes. The point of the suit, I guess, I'm not going to tell people how to design their suit, the point of the suit would be that the areas of discretion have been so vastly changed that the regulation now has been superseded. I don't mean to suggest that that's not a way you could challenge this, but I don't think it's the way you have to challenge this, because to me the real problem is not the linking of deferred action status and work authorization, it's the abuse of deferred action status. That's not a power that includes the power to grant deferred action status to individuals who are on a class-based program. Then you disagree with General Keller, because I think he did say, came up a few times, it's in his brief, you could give an ID card to these people saying low priority, the whole category of people, give them that, but you can't give them work authorization for Social Security. What I would say is we would have concerns if this case were challenging just the enforcement priorities memorandum, and we would have the same concerns if you had that and invited people in and gave them an enforcement priority card. That's not what this case is challenging, so ultimately whether the House has concerns about the enforcement priorities memorandum is really beside the point here, because what this case is challenging is the DAPA memorandum that goes beyond the mere enforcement. So can we break it down? Sure. Are you arguing that the executive does not have the power to defer action of removal against this class of aliens? It all depends on what you mean by defer action. I just said deferred action. I can't answer the question unless I understand whether you're talking about mere forbearance or putting them into deferred action status. We don't believe the executive has the power to put this class of individuals into deferred action status. First of all, there's plainly no statutory authority to do so, but even if you get into the world of their congressional acquiescence theory, the types of deferred action status programs that existed in the past are fundamentally different, both in kind and in scope, from this one. Before 1997, you didn't even have class-based deferred action programs. All of the programs they're talking about pre-1997 are exercises of different powers, powers pursuant to statutes that existed at the time, such as the voluntary departure statute, that no longer is a path for executive action. Can I ask you this then? Because you're an amicus. You're not a party. It's Texas who's the party, and they've made their objections. But suppose I picked up your thought and also coupled it with what the SG said, cross out the words that say special states, and suppose that we would at work to say, look, the question is whether Texas has standing to complain about simply the change in priorities for action. We don't know yet if that affects driver's licenses or could, or could affect benefits or will. But should the administration do so, then they might have a case that they could bring challenging that aspect of the situation. All we're saying is that they do not have that case now, given the SG's concession or agreement or desire to strike those words out. Does that work or not, in your opinion? I'm not sure completely. If I have not been clear, I will not repeat it, but you can forget it. No, no, no. I don't want to be offensive. I just want to be sure I understand the question. I mean, I think, I guess my point is that I don't think anything, either in Texas's view of the case or in our view of the case, that turns on these words, lawful presence being in the DAPA memorandum. Because what matters is the DAPA memorandum, as it says, is designed to make it a path for individuals to be eligible for work authorization. And without DAPA, they're not. And it's also a path to make them, I mean, once they are in deferred action status, that is why they are considered lawfully present. You're not considered lawfully present just because the executive is not actively pursuing removal proceedings against you. Again, CFR, 8 CFR 1.3, it specifically says the decision not to pursue a removal proceeding does not render you lawfully present. So it matters, you know, the words that were used here and the program that's being created matters. It's not enough to have mere forbearance.  So your position is that in 1989, when George H.W. Bush granted deferred enforced departure for Chinese residents after the Tiananmen Square situation, that he acted illegal. No, because that program was justified on a different power than the power here. It was deferred and enforced departure. But there was no statutory authority for him to do that. It is a power that the executive has always grounded in Article II foreign affairs power, a nationality country-based concerned power. Now, there is currently a statute on the books, the Temporary Protected Status Statute, that says it is the exclusive authority through which the executive can grant nationality-based. But that came after this. Right. And at the time, that statute didn't exist. But at the time, there was no statutory authority. Whatever was happening before 1990 doesn't tell you very much about what Congress is acquiescing when Congress passed a statute in 1990 that said these are the circumstances under which you can grant nationality. I appreciate that, and that may be what Congress does here. It may come back and say deferred action is limited in this way, but it hasn't yet. So assuming that we have a history of deferred action for categories of people, then what you're really arguing about, and I stopped or you got interrupted when you were answering me earlier, why are you arguing that the 1986 regulation, which gives the attorney general the right to grant work authorizations to individuals who have been provided deferred action, are you arguing that's unconstitutional? No, because there are statutes on the books that say deferred action status also comes with work authorization. So of course that the statute says that those people, deferred action, can be granted under the statute or by the attorney general. If you're striking out by the attorney general? I was talking about different statutes, not 1324AH3. I was talking about the statutes that actually refer to deferred action, and they say that the executive can grant deferred action and work authorization. So there's nothing inherently problematic about a regulation that implements Congress's precise understanding that in the circumstances where the executive is authorized to grant deferred action. Suppose something is not statutorily authorized. Suppose this is a version of the hypothetical that I gave to General Keller. Suppose DHS decided to do this one by one by one, and in doing it one by one by one also said, and you're entitled to work on the books. Could DHS do that? I think it would ultimately in that instance start to become a question of scope and a point at which you have a policy that is inconsistent with the use of deferred action status, because in the past there have been this kind of ad hoc, de minimis, case-by-case use of deferred action status. So suppose, then again, same kind of question that I gave to General Keller. Suppose that there was a policy, but it was of much less significant scope. Let's say a policy that said if you've been in the United States for 30 years and you have children here, we're not going to deport you unless we decide otherwise, and you're entitled to work on the books. Could DHS do that? No. There is not any congressional authority that allows it, and there is no past practice like it. But this is very significant, right? No past practice like it. There is not any past practice. What was that family policy, family fairness? That was voluntary departure. There was a statute on the books at the time that permitted extended voluntary departure. You no longer can do that. There is no past deferred action program that was for a category of individuals that had no past philosophy. But this is important because you're basically saying that DHS going forward, any administration, cannot have any kind of policy, even if it's much more limited than this kind of policy is, that allows undocumented aliens to work. Congress has passed a statute that says if you are living in this country without legal authority, you cannot work. That's Congress's policy judgment in 1324A. It may disagree with you. Yeah, yeah, yeah. I understand the point. All I guess I'm just saying is this would be an enormous change in practice. Not at all, Your Honor, because the past practices, there are none. They have not pointed to a single deferred action program that granted it to a class of individuals who had no lawful path to status in this country. Is that true of all of the deferred actions mentioned in the appendix, the one that the Congressional Research Service did? Yes. Most of those are not deferred action programs. They're extended voluntary departures. But they made them all different. There's only about four deferred action programs that were class-based. Those all were path to lawful status. U visas, T visas, people who held F-1 visas during Hurricane Katrina. Thank you, counsel. Five minutes, General Verrilli. Thank you, Mr. Chief Justice. First, on standing, I would note that they have no answer to our redressability point. You didn't hear one today. They don't have one. Second, even if you think they got over the Article III hurdle, there's just no way that this license cost injury constitutes something within the zone of interest of any provision within the APA, and they haven't tried to establish that. And then third, with respect to standing, I think Justice Breyer's point about the analogy between the kind of theory that they're advocating here and taxpayer standing and parents' patrioticism is dead-on correct. This would invite exactly the same kind of flood of litigation that you have always said if you want proof of that, it already exists. Texas is already using this theory to sue the United States based on the resettlement of Syrian refugees in Texas, and that will just be the beginning. Now, Justice Alito, you raised a couple of points I want to get to with some specifics. You asked about whether an employee with a deferred action work authorization could sue and if an employer refused to hire. I would direct you on it to 8 U.S.C. 1324B. Actually, Congress has determined the situations in which an employee with an alien with work authorization has a discrimination claim and when the employee doesn't, that statute says if you're a lawful public resident, you do deferred actions on the side where you don't. Well, I was asking about Section 1981. Well, but I think that you have a hard time making that claim, given that Congress has made that kind of a judgment. Now, with respect to the other points Your Honor made, so your position is that there could not be a suit under 1981? What I'm saying is that Congress made a judgment there that bears very directly on it. But now with respect to another point that Your Honor raised about specific statutory references to lawful presence, my friends on the other side have made a huge deal about this, in particular 8 CFR 1.3, which I think they cited you seven or eight times. I urge you to go look at it. I urge you to, in fact, read the rulemaking order that went along with it from 1996. You'll see what it says. It applies to one thing and one thing only. That's the accrual of Social Security benefits under Section 1611B. The rulemaking order, and we quoted this in our reply brief, specifically says that although we're counting deferred action as lawful presence for the purpose of accruing Social Security benefits, for the reason that if you can work lawfully, you ought to be able to accrue benefits, this does not confer any lawful status under the immigration laws. It specifically says that. And so we can argue about whether the executive has the authority to consider people with deferred action as lawfully present in that narrow sense. We think we're right. Maybe they're right. But that is the tail on the dog here. If the phrase lawful presence were stricken from the guidance, would you take the position that DAPA beneficiaries are not lawfully present for purposes of, under certain statutes that use that phrase, for the reentry bar, for eligibility, for federal benefits? The only federal benefit is Social Security. Would you say they were lawfully present for those two statutory purposes? There are regulations that say that they are, and we can fight about that. But that, as I said, that is the tail on the dog. Now, if I could go to the merits. Repeatedly you've heard that the family fairness policy was pursuant to statutory authorization. That's just flat wrong. There's a D.C. Circuit case, and you can read Judge Silverman's opinion in that case that we cite at page 49 in our brief, which specifically describes it as extra statutory, which is what it was. Now, the other key point, and I think this is really important, their theory about the scope of who can get work authorization is that either Congress has to specifically say you get work authorization, or Congress has to specifically authorize the Attorney General, now DHS, to decide whether people in this particular category can get work authorization. Forget about deferred action. There are millions of people who get work authorization under existing law now who couldn't get it if that were the proper interpretation of the law. These millions of people are in proceedings for adjustment of status. The hundreds of thousands of people are in proceedings for cancellation of removal. The hundreds of thousands of people have parole. None of those people qualifying are there reading the statute. That is why, in 1987, when INS had a rulemaking proceeding about this, they rejected it. It would completely and totally upend the administration of the immigration laws, and frankly, it's a reckless suggestion. It's just – and they just –  Exactly. There are all kinds of statuses that don't qualify as lawful status that people have always been allowed to get work authorization during the period in which time where their presence is tolerated. How many people are we talking about with those? Millions. Millions. There are – Is it the asylum applications? No, but the adjustment of status, 4.5 million since 2008, and cancellation of removal, 325,000 since 2008. Huge numbers. Thank you. Thank you, General. The case is submitted.